## SMITH *vs.* GRIFFIN.

1. Upon the trial of a case in equity, brought by a legatee against an executor, for account and distribution, if it appear that the inventory furnished by the executor to the appraisers shows only the aggregate of debts due the estate, without the names of the debtors; and if the appraisement of personalty (there being realty also) amount to a large sum, and subsequent returns of the executor (not being made annually) show only expenditures and no receipts; and if the answer of the defendant be vague and unsatisfactory, after the lapse of many years, great latitude should be allowed the complainant in offering evidence to charge the defendant. All evidence (not positively illegal) tending even remotely to elucidate the case, should be admitted.

2. If an executor sell the effects, assets or choses in action of the estate without an order of the Court of Ordinary, or other lawful authority, at private sale, he is liable for the real value, if that be greater than the price for which he sold. And in the case of a chose in action, thus sold, if the real value cannot be ascertained, his liability would be either for the amount of the sale, or the sum appearing upon the face of it, to have been due, as the one or the other might be the larger sum.

3. In such a case as that stated in the first syllabus, it is error in the Court to charge the jury that, after having put the inventory of choses in action in evidence, the complainant must "go farther, and show the

money due upon those choses in action to have been collected or collectable."

4. In such a case it is error in the Court to charge the jury " that the returns of the defendant, having been allowed by the Court of Ordinary, and thus adjudged by a court of competent jurisdiction, are *prima facie* evidence for the defendant, and will be conclusive, unless reversed or impeached for fraud or other cause." Returns made by an executor or administrator appearing, upon inspection, to have been made contrary to law, or to be fraudulent, do not make a *prima facie* case for him, and are to be taken strongly against him.

5. A judgment of a Court of Ordinary allowing a schedule of debts returned by an executor or administrator as desperate, is *prima facie* evidence for him, and will, of course, be conclusive on a trial of a bill for account and distribution, unless rebutted. But it is competent for the complainant to prove in rebuttal that any debtor named in such schedule was solvent, and that by the use of due diligence payment of the debt might have been enforced. Such evidence, if credible, is sufficient to shift the onus and require the defendant to show why the debt was not collected. In such a case, it is the province of the jury to determine, from all the evidence, whether or not the defendant shall be charged with the debt.

In Equity, in Dougherty Superior Court. Tried before Judge ALLEN, at the June Term, 1860.

On the 12th day of October, 1847, Thomas P. Smith filed his bill in equity in the Superior Court of Baker county, against Hardy Griffin, to which bill several amendments were made, in one of which amendments the complainant alleged that, owing to a failure on the part of the custodian of the records to find and give him access to said records, he did not ascertain and find out the frauds, wastes, devastavits, and mismanagements perpetrated by the defendant, and set out in the bill, until after the original bill had been filed, and that the frauds being undiscovered, the statute of limitations, or lapse of time, was not in his way so as to bar his recovery.

The bill and amendments embody the following allegations and charges, to-wit:

On the 4th day of February, 1819, Benjamin Smith executed his will in Laurens county, in which he directed that, after the payment of his debts, his executors should keep

the residue of his property together, for the support of his wife and children, until his oldest child should become of full age, when his or her distributive share should be given off to such oldest child; and that the residue of the property should be still kept together, until the next child become of age, and his or her share should be given off as before, and so on, until the youngest child should arrive at full age. Hardy Griffin and Britten Jordan were appointed executors by the will. In 1819 the testator died, and the will was proved and recorded in the proper office in said county of Laurens, by the said Hardy Griffin, who alone qualified as the executor of said will. The testator left five children, to-wit: the complainant Thomas P. Smith, James B. Smith, Eliza Smith, who afterwards intermarried with John Jordan, Mary W. Smith, who intermarried with Green H. Brazeal, and Nancy W. Smith, who intermarried with John Chapman. Mrs. Chapman afterwards died, leaving two children surviving her. Hardy Griffin took the charge and possession of the testator's estate, consisting of lands, negroes, stock of various kinds, household and kitchen furniture, money, notes and other choses in action, of the aggregate value of twenty thousand dollars, over and above the payment of all debts and charges against the said estate. Complainant, who, as one of the children of the testator, is entitled to one-fifth of the net proceeds of said estate, has, time and again, demanded an accounting and settlement from the said Hardy Griffin, who has failed to settle and account with the complainant, falsely pretending that the estate was insolvent, that nothing was due complainant, and that having made full returns and settlements with the Inferior Court of Laurens county, when sitting for ordinary purposes, he, the said Hardy Griffin, had been discharged from his trust as executor of said estate.

The bill alleges that if the said Hardy Griffin has made any settlement, as he pretends, the same was unfair, untrue, and fraudulent, and that if he has been discharged from his trust, the discharge was obtained by fraud and imposition upon the Court; that Griffin has lately admitted to E. H Platt, Esq., that there was one error in his account with said

estate, and against said estate, of $10,000; that complainant expects to be able to show on the trial of this case many errors, frauds, cheats and other wrongful acts, which he charges to have been committed by the said Griffin, by which the said Griffin has converted said estate to his own use, and deprived complainant of his rights in the premises; that said Griffin erred in his returns in charging said estate with the sum of $11,047 86, when the item should have been only $1,147 86; that said Hardy returned, as having been paid by him, accounts against said estate, as follows, none of which were due from said estate, and which said Griffin knew were not so due, to-wit: an account in favor of William Vickers for $425 60: a note in favor of William Faircloth for $470 48, neither of which were ever returned until after the death of Vickers and Faircloth; one in favor of said Griffin for $162 39; two in favor of C. S. Guyton, one for $1,047 86, and the other for $1,039 52; one in favor of Charles Creach for $161 50; one in favor of Samuel Carson for $58 87; one in favor of Eli Shorter for $40 00; one in favor of David Creach for $54 05; one in favor of Judy Averitt for $37 50; three in favor of Dickerson Ricks, one for $40 00, another for $116 18, and another for $9 43; two in favor of Benjamin Dorsey for $565 61; one in favor of Benjamin Averitt for $137 62; one in favor of William R. Peck for $387 67; two in favor of Amos Love, one for $109 00, and the other for $500 00; one in favor of A. Love & Co. for $500 00; one in favor of the same for $600 00; two in favor of Uriah Richardson, one for $318 29, and the other for $105 56; one in favor of Benjamin Faircloth for $47 60; one in favor of Henry Partridge for $76 70; that the said Hardy Griffin returned to the said Inferior Court of Laurens county, when sitting for ordinary purposes, claims due said estate, and represented as being desperate, and on insolvent debtors, when in truth and in fact the claims were perfectly good, solvent and collectable, with reasonable diligence on the part of said Griffin, which claims are as follows, to-wit: one against the estate of B. Averitt for $7 89; one against Dawis Griffin for $4 50; one against Elizabeth Griffin for

$3 29; two against the estate of S. Carson, amounting to $102 18; one against Ashton Thomas for $3 75; one against Wright Saunders for $5 00; one against Thomas Barbour for $6 75; one against Jesse Fulgium for $24 87; one against J. Fulgium and B. Smith for $25 00; and one against William Hair for $37 50; that at the time Griffin took charge of the said estate the property inventoried was appraised at $7,729 02, and that the notes and accounts due to said estate amounted to the aggregate sum of $9,615 99; all, or most all of which, said Griffin collected, and yet never made any return of one dollar received for said estate; that said Griffin failed to make annual returns of the business and transactions of said estate, never having made but three returns, to-wit: one in 1820, another in 1824, and another in 1828; that said Griffin sold cattle, lands, cotton, goods, wares and merchandise, which were never inventoried, and which belonged to said estate, for the aggregate sum of $7,-200 00, which he never returned or accounted for, but appropriated to his own use: that said Griffin took away from the farm of the estate two horses, worth $150 00; and corn and cotton, made in 1822 on the farm, worth $1400 00; sold said horses, corn and cotton, and neither returned or accounted in any manner for the proceeds. The bill further charges that the said Griffin, being poor when he took charge of said estate, accumulated negroes and other property, built fine houses, wore costly clothes, rode in a fine carriage, drawn by fine horses, prosecuted heavy law suits, and maintained a style of expensive and dissipated living, which could be accounted for on no other reasonable hypothesis but that of a wrongful appropriation of the proceeds of the said estate to his own use and purposes, to the detriment and injury of the complainant.

The bill prays for a discovery as to the facts charged, and that the defendant may account to complainant for his share of said estate.

The defendant set up in a plea, and also in his answer to the original bill and amendments, that the complainant's

right, if he had any, was barred by lapse of time, and the statute of limitations.

The defendant, by his answer, admits the publication of the will, the death of Benjamin Smith, and the number and names of his children as stated in the bill. The defendant also admits that he alone qualified as executor, and assumed the execution of the will; that testator had some land, the location and value of which he does not recollect, and four or five negroes, all of which were sold under executions against defendant as executor, but he cannot, from lapse of time and loss of his papers and memoranda, state how much the said land and negroes sold for, or under what particular executions the sale was had, but the proceeds were applied by the proper officer to the payment of the *fi. fas.* He alleges that the appraisers were not appointed or sworn according to law, to value the property of said estate, and that the same was largely overvalued by said appraisers, and insists that he is not bound by such appraisement; that testator had no money on hand when he died; that he had some household and kitchen furniture, worth not exceeding $150, two horses and some hogs and cattle, not exceeding in value $575, all of which were sold according to law, and applied to the payment of debts against said estate; that the principal assets of said estate, was the remnant of a stock of goods valued by the appraisers at $2,500, and twenty-nine bales of cotton, valued at $1,219, all of which were sold by defendant on a credit, to persons then solvent, but who afterwards became insolvent, and that, owing to the almost universal bankruptcy, which prevailed in Georgia, in the years 1820, 1821 and 1822, a large portion of the purchase money and debts due to said estate were not collected, but said failure to collect was not the result of fault or negligence on the part of defendant; that over and above the debts of said estate, returned by defendant as desperate, there was a loss on the choses in action belonging to said estate of over $1,800; that he cannot, now, after a lapse of thirty years, give a statement of the debts against said estate, but he denies that they were inconsiderable, but amounted to not less than

Smith *vs.* Griffin.

$8,000, all of which defendant paid as far as he had assets, and oftentimes out of his own money; that he did not appropriate to his own use any of the assets of said estate, but, on the contrary, advanced out of his own pocket large sums of money for the support of the widow and orphans of the said testator; that when he took charge of the estate he believed it to be solvent, and, under this belief, paid many debts of inferior dignity, and afterwards had to, and did pay out of his own funds other debts which were entitled to payment in preference to said debts 'of inferior dignity, and that, as the estate turned out to be insolvent, and no one but defendant was to be injured by it, he did not deem it necessary to make annual returns and hence, failed to do so; that from the time testator died up to the time the negroes were sold, they were worked on the farm of deceased, but did not make a support any one year that they were so worked, and defendant paid for the sugar and coffee used by the family during that time out of his own funds; that, at this late day, he cannot give an account of the debts due to and from said estate, but denies that there was any surplus to be divided amongst the legatees of the testator after the debts were paid; but, on the contrary, much of the maintenance, board, and education of testator's children, was paid for by defendant out of his own private funds, and from the acquiescence of the complainant for many years after he arrived at full age, led defendant to believe that he was perfectly satisfied with the fidelity of defendant's management of said estate; that if complainant had called on defendant sooner, and had expressed any dissatisfaction on the subject, defendant could have satisfied him from books, papers, and vouchers, (which are now destroyed) that he had actually advanced and paid more for said estate than he ever received; that complainant never called on him for a settlement, nor did defendant ever contend that he had been discharged from the executorship of said estate; that, since the filing of the bill, he has found and appends a transcript and statement from the docket of Laurens Superior Court, of various judgments and *fi. fas.* against him as executor of said testator, and as surviving

partner of a firm, under which testator and defendant once carried on a mercantile business, which defendant sold out to testator, the said testator agreeing to pay the debts against the firm, which he failed to do.   These judgments were paid by defendant, but are not included in his returns made to the Court of Ordinary; the statement is as follows: one *fi. fa.* in favor of William Godfrey, for the sum of $171 09; one in favor of S. J. Bryan, use of, etc., for $456 22; one in favor of William Butler, for $360 88; one in favor of William Godfrey, for $302 66; one in favor of Amos Love, for $160 83; two in favor of Andrew Love & Co., one for $1,401 59, and the other for $307 71; three in favor of Thomas Butler, *adm'r de bonis non,* one for $64 28, one for $214 26, and one for $185 44; two in favor of Lowe, Taylor & Co., one for $1,006 65, the other for $992 53; and one in favor of Whitaker and wife, for $1,876; that these *fi. fas.* amount, in all, to about $7000.   The defendant insists and alleges that the returns made by him of payments are true, that he paid the several sums in good faith, as genuine claims against the estate, and that the claims returned as desperate and uncollectable were, in fact, of that character; and he insists that, as these returns were passed upon and allowed by the Inferior Court of Laurens county when sitting for ordinary purposes, the judgment that they were correct is a bar, and conclusive as a protection to defendant against the relief sought by the bill.

The bill and answer were amended several times, and one amendment to the bill charged the answer by specifications to be false, and re-asserted the allegations of the original bill, which the answer again denied, but it is believed that the substance of the bill and answer is sufficiently given to understand the questions made and decided by this Court.

The case was removed to Dougherty, when the said county of Dougherty was created.

On the trial of the case, the bill and answer were read; the complainant introduced in evidence, the will of Benjamin Smith; the inventory and appraisement of the property of Benjamin Smith's estate; the different returns of the defend-

ant, as executor, made in 1820, 1824, 1825 and 1828. Also the depositions of Richard M. Orme, showing an advertisement in the *Southern Recorder*, of the 2d of July, 1822, by U. Kinchen, sheriff of Laurens county, of negroes, Ben, twenty-two years old; Charles, four years old; Henry, three years old; Tilman, one year old; Brady, twenty-two years old; Charlotte, twenty-eight years old, Malinda, five years old; and one hundred acres of land, part of lot No. 170, with a good dwelling on it; lot No. 161; one hundred and one and one-fourth acres of lot No. 171, all lying on Rocky creek, and one lot on Bogay branch, all to be sold as the property of Benjamin Smith, deceased, to satisfy two *fi. fas.* in favor of A. Lowe & Co., and others.

Also a certified copy of defendant's depositions, taken in an equity case in Dooly Superior Court, in favor of Ford *et al.*, distributees of Joab Tison *vs.* Abner Tison, administrator, *et al.*, in which said defendant testified: That he once held a *fi. fa.*, as executor of Benjamin Smith, deceased, against Joab and Littleton Tison, for $2,000 or $3,000, for cotton bought at the sale of said Smith's estate, and that Moses Tison, the father of Joab and Littleton, paid him $500 on the *fi. fa.*, and that the *fi. fa.* was sold to old man Tison; that Joab Farrow had a negro, named Farrow, in his possession in the year 1822 or 1823, worth $500; that in 1818 or 1820, he was in Savannah, and saw Joab Tison with twenty-five bales of cotton, said to be his father's, but that he, Joab, said he was going to sell it to pay his own debts.

Also the depositions of Francis Thomas, proving that he was the clerk of the Superior and Inferior Courts of Laurens county, and had searched the dockets of the said Courts, from the year 1818 to 1828, and could find no case in which Benjamin Smith was defendant, but finds many cases against Hardy Griffin, as executor of Smith, and many against him, individually; that he had examined the tax books of Laurens county from 1819 to 1823 inclusive, and finds that Hardy Griffin returned property as taxable, as his own, and as executor of Benjamin Smith, as follows: in 1819, as his own, seventeen slaves; in 1820, as his own, six slaves, and as Smith's

executor, five hundred and six and one-fourth acres of land, and six slaves; in 1821, as his own, eight slaves, and as Smith's executor, five hundred and fifty-seven acres of land, and seven slaves; in 1822, as his own, eight slaves, and as Smith's executor, five hundred and fifty-seven acres of land, and eight slaves; in 1823, as his own, nine hundred and one-fourth acres of land, and nine slaves, and as Smith's executor, one hundred acres of land. To the depositions of this witness was appended a statement from the Bench and execution dockets of Laurens Superior Court, of various cases against Griffin, as executor of Smith, and as surviving partner, and individually, which statement contains the same cases as those embodied in the statement referred to in defendant's answer, except the case of Whitaker and wife, and one, of the case of Lowe, Taylor & Co. The statement also contained various cases in favor of parties nowhere mentioned in the pleadings, and which were against the defendant, individually. This last part of the statement was repelled by the Court, on objection being made thereto.

Also the depositions of Benjamin Dorsey, proving that he loaned Benjamin Smith $200, taking a due bill therefor; that after Smith's death, Griffin paid him the amount and the interest thereon; that this was all the claim that witness had against Smith's estate; that he knew Benjamin Averitt well; he was a poor man, had no property that witness knew of, although he resided near him; Averitt kept a mill, and was in the habit of gambling; that witness' land joined that of Benjamin Smith, and Smith's land was worth $4 per acre.

Also the depositions of James Gainer, proving that he was acquainted with Jesse Fulgium, who was a farmer; lived in Early county in 1818 and 1819; was in possession of three or more slaves and a horse or horses, and was deemed by the witness, good for his contracts.

Also the depositions of Enoch Farmer, proving that his father, Jacob Farmer, once lived in Laurens county, but afterwards removed to Alabama; that he had long since died, and left property, amongst which was a valuable negro blacksmith; that witness never heard of any proven accounts, or

Smith *vs.* Griffin.

other indebtedness against his father's estate, in favor of Hardy Griffin, in his own right, or as executor of Benjamin Smith.

Also the depositions of Moses Guyton, proving that he was the brother of Charles S. Guyton, and was upon familiar and confidential terms with him in the years 1819, 1820, 1821 and 1822; that during those years, he was clerking for his brother, John Guyton; that during those years, his brother, Charles S. Guyton, was not worth $1,000, exclusive of two negroes, and a lot of land in Hall county, which he then owned; that during all their familiar, confidential intercourse, he never heard his brother, C. S. Guyton, speak of Benjamin Smith or his estate being indebted to him; that it is possible Griffin may have paid him $1,000, but witness knows nothing of it; witness believes that C. S. Guyton acted as sheriff, or deputy sheriff, about those times, but whether in the year 1823 or not, witness does not know.

Also the depositions of Daniel Powell, proving that he knew Samuel Carson, who once lived in Laurens county, and afterwards moved to Jefferson county, and there died in 1821 or 1822; that he owned nothing but a little house and furniture, and a " chunk" of a horse; that he had nothing to live on but his labor, and was deemed by witness insolvent.

Also the depositions of James B. Smith, a brother of complainant, proving that, in the month of August, 1822, the negroes of Benjamin Smith's estate were sold by the sheriff; that on the plantation, under Griffin's charge, there was, of cotton and corn together, about one hundred acres in cultivation; that there were two mares on the place, in charge of Benjamin Thompson, the cropper of Griffin; that Griffin sold one, named Jinney, to Thompson for a yoke of oxen, and took one, named Hurricane Filly, away with him, and kept her as long as witness knew her, which was about one year; that in the years 1821 and 1822, Griffin drank and gambled; that he built a fine house, wore costly clothing, and a musical watch, costing $300, drove a fine horse and vehicle, the cost of which witness does not know; that he also bought two negroes about that time, named Nath, and Ned;

that Charles Creech built a gin house for Griffin, and told the witness, in 1828, that he owed the estate of Benjamin Smith; Creech was poor and intemperate; that David Creech was poor, hard run, had a large family, was intemperate, and overseed for Griffin in the year 1822; that from 1823 to 1826, the complainant lived in Washington county, and from 1831 to 1833, he lived in Laurens county, and if Griffin ever paid for his board, tuition or any other expenses, the witness never knew or heard of it, and the witness does not believe that Griffin did; that the year the plantation was broken up, there were made on it seven or eight hundred bushels of corn, and six or seven bales of cotton, all of which was taken off by Griffin, and housed and mixed with his other produce.

Also the depositions of Henry Cooper, proving that he was a citizen of Laurens county in 1819, and that shortly after the death of Benjamin Smith, he bid off, at an auction sale of his property, a stock of cattle, at that time in Alabama, in charge of Silas Johnson, for which the witness paid Griffin, executor of the said Smith, $116 16.

Also the depositions of James Taylor, proving that he and Andrew Lowe and James Lowe, under the mercantile firm of Lowe, Taylor & Co., commenced business in Savannah in 1828, and dissolved in 1834; that the firm sold goods to Hardy Griffin, who failed to meet his notes at maturity, and they were placed in the hands of attorneys for collection; that one of his notes for $1,067 33 was placed in the hands of E. D. Tracy, of the law firm of Tracy & Butler, in 1834; that the goods were sold to Griffin on his individual responsibility, and if he had a partner, or gave security, witness does not recollect it; the witness is quite sure the firm of which he was a member never got the money on the note; the goods were sold to Griffin for re-sale in Laurens county.

Also the depositions of Charles Creech, proving that he owed Benjamin Smith a store account, and Smith owed him for some work done for him; that after Smith died, his executor, Griffin, sued the witness on several notes in the Justices' Court, obtained judgment and *fi. fa.*, which were levied

on the horse and crop of witness, and the horse and crop were sold and bought by Griffin; witness did various jobs of work for Griffin; Griffin got a bale of cotton belonging to witness, under pretence of paying off said executions; that for the work done by witness for Benjamin Smith he never received one cent from Griffin; that he never presented a proven account on Smith's estate to Griffin, nor did Griffin ever have any showing that he had paid witness a cent, to the best recollection of witness.

Also the depositions of Silas Johnson, proving that he delivered to Henry Cooper nineteen head of cattle belonging to the estate of Benjamin Smith, deceased, according to the order of Hardy Griffin, in the year 1819, at which time cows and calves were selling at from $25 to $30.

Also the depositions of Mary Stewart, proving that she was the sister of Benjamin Smith, deceased; that her first husband was named William Vickers; that her father left some negro property to her mother for life, and after her death, to be divided among his children; that, in this property, the witness had one-fifth interest; that her husband never sold it to Benjamin Smith or any one else; that said Smith claimed two shares in the negro property, his own and his brother Jerry's, and in 1824 or 1825, Griffin came to the house of witness' mother, in Newton county, and made some proposition about the negroes, which disturbed witness' mother very much, and which she rejected; that witness never heard of any proven account for her share in the negroes being presented to Griffin by her husband, or being paid by Griffin; that when Griffin came to Newton county to see witness' mother, Vickers had been dead several years; that the witness sold her share in the negroes to a Mr. Bridges, of Coweta county; that Benjamin Smith told witness, a short time before his death, that he had made over $10,000 in a short time; that the witness knew Jesse Fulgium, and that he was a man of property, and considered good for his debts.

Complainant also introduced in evidence two *fi. fas.* from Laurens Superior Court, in favor of Andrew Lowe & Co. *vs.*

Hardy Griffin, surviving partner; one dated 28th March, 1822, issued from a judgment dated 12th of March, 1822, for principal $978 09. This *fi. fa.* had a levy on it, upon the property mentioned in the testimony of Mr. Orme, and also that the property sold for $2,070, part of which was paid to other *fi. fas.* These entries were signed by U. Kinchen, Sheriff. There was also on the *fi. fa.* a receipt to Kinchen for $525, dated 11th September, 1822, signed by Rockwell Morgan; also a receipt to Kinchen for $720 29, dated 7th August, 1823, signed by Arthur A. Morgan for S. Rockwell, survivor of Rockwell & Hepburn, plaintiff's attorneys. Also, an undisposed of levy, on a negro named Ned, as the property of Griffin, dated 9th January, 1823. Also, a receipt signed by nobody, to Hardy Griffin for $105 59, in full for the *fi. fa.* dated 11th January, 1823. The other *fi. fa.* was dated 1st January, 1824, issued from a judgment dated 26th April, 1823, for $515 75 principal, and $490 94 interest to judgment. On this *fi. fa.* was a levy on a negro named Nathan, and one named Captain, as Griffin's property, dated the 22d of March, 1824; and a receipt of the same date to Griffin for $1,047 86, signed by C. S. Guyton, Sheriff; a receipt to Guyton, dated 3d May, 1824, for $1,044 52 in full of principal, interest, tax, and jury fee, signed by S. Rockwell, plaintiff's attorney.

Complainant also introduced a certified copy of a receipt returned by Griffin to the Court of Ordinary of Laurens county, on the 13th of November, 1824, dated 22d March, 1824, signed by C. S. Guyton, acknowledging that Griffin, the surviving partner of Smith & Griffin, had paid him $1,047 86, on a *fi. fa.* against said Griffin, in favor of Andrew Lowe & Co., which money was paid on said *fi. fa.*

Complainant introduced the Hon. Lott Warren, who tesfied: that he was a clerk for Amos Love & Co., in Dublin, previous to 1820; that he knew Jacob Farmer, Davis Griffin and Thomas Barlow; Farmer was good; Davis Griffin, was a brother of defendant, and was a young man highly respected, whose parents had means; Barlow was a man of age, and had means to pay all his contracts; witness would have

credited any of them for his employer; Amos Love died in the winter of 1823 and 1824; witness knew Kinchen well; in 1819, he was a young man, without visible means except a horse; witness knew him up to 1824; Kinchen was Sheriff of Laurens county, but never had any property to any amount; finally he fell into habits of dissipation, and became pecuniarily worthless; Charles S. Guyton was a very young man in 1819, and was clerking for his brother; in the early part of 1819, cotton was worth from 25 to 30 cents, but went down very low in the fall of that year; in the year 1822, cotton was worth seven cents at least, and corn was worth that year, in Laurens county, at least, 50 cents per bushel.

Complainant then offered the following evidence, which, upon objection being made thereto, was repelled by the Court, on the ground that the same was not relevant to the issues in the case, to-wit:

The depositions of Timothy Sears, proving that Hardy Griffin, as executor of Benjamin Smith, deceased, recovered sixty-four judgments before witness, as a Justice of the Peace in Laurens county, against Joab Tison, maker, and Joseph Davidson, Sen., John Davidson and A. W. Jordan, endorsers; that *fi. fas.* were issued, and property sold under them, and that a number of the executions were satisfied by the constable in presence of witness; that Tison and the Davidsons were good at that time, but afterwards became insolvent.

The depositions of William Z. Bailey, proving that he overseed for Griffin in 1821, and worked for him on his place in the following two years; that he received with his wife three negroes, but got none from his father; that during the years 1820, 1821, 1822 and 1823 he bought four negroes, Ned, Sylla, Harriet and Nathan; that he also built a two story house, the cost of which he does not know; that he had fine horses, and good vehicles, and a musical watch, which he said cost $200; that Griffin told witness that Jack Brown won from him at Milledgeville $500, before his seat warmed in the chair; that Griffin sold a horse, named Selim, to Henry Fuqua for $200.

The depositions of Henry Fuqua, proving that the general impression was that Griffin was managing Smith's estate badly; that his conduct was not that of an economical executor; that he "was acquainted with all those men—was a merchant at the time, and sold them goods on time, and collected the amounts. They were all considered responsible for their contracts."

The depositions of Francis Thomas, proving that he was Clerk of Laurens Superior Court, and had examined the docket thereof from the year 1820 to 1832, and found a case, brought by E. Warren to the April term, 1830, in favor of Lowe, Taylor & Co. vs. Hardy Griffin, which is marked dismissed at plaintiff's cost; that he finds a case of Assumpsit, brought to the April term, 1832, by Tracy & Butler, in favor of Lowe, Taylor & Co. vs. Hardy Griffin, in which judgment was confessed at the October term, 1832, returnable to April term, 1833, in favor of Lowe, Taylor & Co. vs. Hardy Griffin, for principal $914 24, interest $70 37, and cost $8 37; that these cases and this *fi. fa.* were against Griffin individually, and not as executor, as appears from the dockets. A transcript from the docket accompanied the depositions.

The depositions of William Hair, proving that he removed from Laurens county in 1815, and did not leave a debt behind him; that he did not owe the estate of Benjamin Smith one cent, and if the executor returned a note or *fi. fa.* against witness it was not true, but fraudulent; that there was a William Hare residing in Laurens county when he left there.

A transcript and statement from the Bench and execution dockets of Laurens Superior Court, duly certified to by the Clerk, of the case and *fi. fa.* mentioned in Thomas's testimony, before given.

Counsel for complainant excepted to the decision of the Court, repelling said testimony offered and rejected as aforesaid.

Counsel for complainant requested the presiding Judge, amongst other things, to charge the jury: "That if an executor or administrator sells the effects, assets, or choses in action belonging to the estate of his testator, or intestate,

without an order of Court, or other lawful authority to do so, but sells them at private sale, at a reduced price, he is chargeable with their nominal value."

This charge, the Court refused to give, and complainant excepted.

At the request of counsel for the defendant, the Court charged the jury, amongst other things, as follows, to-wit:

"That the inventory of the choses in action, promissory notes and books of account of Benjamin Smith, deceased, is merely *prima facie* evidence to charge the executor with them, as assets,—it may not be sufficient of itself, but that the evidence ought to go further, and show the money to have been collected, or was collectable.

"That the returns of the defendant having been allowed by the Court of Ordinary of Laurens county, and adjudged by a Court of competent jurisdiction, are *prima facie* evidence of the correctness of the returns, and will be conclusive, unless reversed, or impeached for fraud or other cause.

"That the return of certain notes and accounts as desperate, cannot be impeached by evidence, simply of the solvency of the debtors; that complainant must not only show the debts to have been solvent, but that they were collectable, and that without such evidence, the judgment of the Court of Ordinary, allowing said accounts and notes as desperate, is conclusive.

"That whilst the appraisement is *prima facie* evidence of the value of personal property, it is not conclusive; that if the evidence shows any of the goods and chattels to have sold for less than the appraised value, and the sale was a fair and *bona fide* one, the defendant is only chargeable with the amount of such sales."

Counsel for complainant excepted to the charges thus given.

The jury returned a verdict in favor of the defendant.

Counsel for plaintiff in error, asks a reversal of the judgment, on the ground:

1st. That the Court erred in rejecting the depositions of Sears, Bailey, Fuqua, Thomas Hair, and the certified exem-

plification of the dockets of the case of Lowe, Taylor & Co. vs. Hardy Griffin.

2d. That the Court erred in charging, as requested by counsel for defendant, and in refusing to charge, as requested by the complainant's counsel.

HENRY MORGAN for plaintiff in error.

STROZIER and IRWIN & BUTLER *contra*.

*By the Court*—JENKINS, J., delivering the opinion.

The first exception appearing in this record is to the exclusion, by the Court below, of the testimony of the witness Sears, offered by the plaintiff. His evidence is certainly not very clear or very definite; but it does throw some light upon a transaction now enveloped in obscurity, which should have appeared, clearly and fully, just as it occurred in the returns of the defendant as administrator, to the Ordinary. It may be well to say here, at once, that the peculiar circumstances of this case seem to demand a relaxation of the rules of evidence, or rather, that conformity to the rule allowing the admission of the best evidence of which the nature of the case admits, inevitably lets in such as is not of a very satisfactory or conclusive character. It is now more than forty years since the transactions brought under investigation had their inception. The plaintiff was then a mere child, quite incapable of comprehending such of them as may have transpired in his immediate presence, and scarcely able to remember what may have been witnessed, but not comprehended. Many persons who were either parties to, or witnesses of, the transactions have passed away, whilst the memory of others has lost its grasp of the facts. Charity, perhaps, requires us to concede that much of the vagueness and uncertainty of defendant's answer is attributable to his own forgetfulness of things done by himself, after the lapse of so many years. We cannot, however, indulge a charity so abounding, as to excuse him for having failed to perform a duty required by the law of the land, in terms so simple as to be easily com-

prehended by the poorest capacity—the duty of making to the proper authority, to be recorded and preserved as a perpetual testimony thereof, annual returns of his receipts and expenditures as executor.    When we come, in a more appropriate connection, to consider that point, it will be seen *how* that duty has been performed.    It is enough to say, here, that it has in part been so done, and in part so omitted, as to envelop the history of this case in a cloud of obscurity, and as to render the administration of full and equal justice a hopeless attempt.    This malfeasance and non-feasance, on his part, imposes on the Court charged with the quest after truth, the necessity of admitting every thing not in absolute violation of the rules of evidence that may tend, even remotely, to elucidate the case.

Of this character is the testimony of Sears.    It gives some clue to the amount of the debt due the estate of defendant's intestate, to which he testifies, and to the practicability of realizing it by the exercise of due diligence.    It does contain statements which a jury might and should well and carefully consider, in the absence of clearer proof, which it was the bounden duty of defendant to furnish.    To exclude it from them, therefore, was error.    So of the testimony of Bailey, the rejection of which furnishes the ground of the second exception.    It tends to show the pecuniary condition of the defendant at the time he entered upon this administration— its apparent improvement shortly afterwards—his more liberal style of living, and freer expenditure, and his probable sources of revenue.    It has a bearing upon the question raised by a charge in the bill, that he converted to his own use the assets of the estate, which he is now called upon to account for, and should have been admitted.    We are constrained to put our judgment upon the exception to the rejection of Fuqua's testimony, hypothetically.    This witness testifies that he " was acquainted with all *those men ;* witness was a merchant *at the time,* and sold them goods on time, and collected the amounts.    They were all considered responsible for their contracts."    Who " *those men* " were, what " *the time,*" and what their relation to the estate, neither appears

from the witness' answers nor the record. Doubtless the names of "*those men,*" and "*that time,*" are disclosed in the question he is answering, but the questions in all cases of depositions, taken under commission, are omitted in the brief of evidence. We can, then, only say, that if upon reference to the question or questions which elicited the answer above quoted, the names of persons are disclosed who are debtors of this estate, and whose debts were returned by the defendant as desperate, or were not accounted for, and if "*that time,*" of which he speaks, should fall within the range of defendant's administration, the rejection of that testimony was error. So much of Fuqua's evidence as relates to the general impression that defendant was administering the estate badly, and that his conduct was not that of an economical executor, was properly rejected. The testimony of the witness Thomas, and the transcripts from the dockets, as testified to, and as certified by him, were, we think, erroneously ruled out by the Court, because they appear to furnish the best evidence the nature of the case, as exhibited by him, admitted of. The testimony of this witness, we think, brings the transcripts rejected within the operation of the Act of 21st Dec., 1819, Cobb's Digest, 272, and the Act of 21st Dec., 1830, Cobb's Digest, 273.

The testimony of the witness Hair (without other evidence showing that he had been a debtor of this estate,) was properly rejected, because he testifies that he owed the estate of Benj. Smith nothing, and that there was residing in the county of Laurens when he left there, another William Hair, or Hare.

2. The next exception assigns error in the refusal of the Court to charge, as requested by plaintiff's counsel, "that, if an executor sell the effects, assets, or choses in action of the estate he administers, without an order of Court, or other lawful authority, at private sale and at a reduced price, he is chargeable with their nominal value." We do not readily understand what the nominal value of any of those subjects of administration is, except choses in action. We presume, the amount of indebtedness appearing upon the face of a chose in

action, is the "*nominal value*" referred to. But what is the nominal value of a mule, of a bolt of calico, or of a bedstead ? The true rule in the case made in the request, is that he is liable for the *real* value, if that can be ascertained, and is greater than the sum for which the thing was sold. In the case of a chose in action, if the real value cannot be ascertained, then the liability would be either the amount of sale, or the sum apparent upon the face of it, as the one or the other might be the larger sum.

3. The next exception assigns as error, the following charge given by the Court, at the request of the defendant's counsel, viz : " That the inventory of the choses in action, promissory notes, and books of account of Benj. Smith, deceased, is merely *prima facie* evidence to charge the executor with them as assets·; it may not be sufficient of itself, but that the evidence ought to go further and show the money to have been collected or collectable."

This charge is obnoxious to the objection of inconsistency. The first clause assigns to the inventory the character of *prima facie* evidence, to charge the executor, whilst the latter clause conveys the idea that it is not sufficient of itself, and that it is incumbent on the party seeking to charge the executor, to go further, to offer more stringent proof. We understand the effect of *prima facie* evidence to be,· to shift the *onus*—to establish the fact in issue, unless rebutted by the party sought to be affected by it. But to say of evidence that is insufficient, that the party adducing it should have produced more, is to say that it does not shift the *onus*—that it is not *prima facie* evidence of the fact in issue. The instruction given the jury " that it was necessary for the complainant to show that the money was collected or collectable," was particularly objectionable, as applied to this case, and this is the form given to it—a rule to be applied to this estate—not a general rule of law. Conceding to the Court below, for argument, that the general rule is as declared in the charge, we should hold that this case is an exception. Looking to the inventory, as exhibited in the transcript, we find no schedule setting out the names of debtors, and the

sum due by each, and the class to which the debt belonged. But at the foot of the inventory and appraisement of chattels, are two items, one of which specifies the aggregate of debts by promissory notes, and the other the aggregate of debts in open account. The inventory does not exhibit the name of any debtor, nor the amount of any debt. When this plaintiff arrived at years of maturity, he could not, by recourse to the records of the Ordinary, acquire any specific information whatever on these points from the inventory—and now, that he resorts to the conscience of the defendant, he is not assisted. There is no inventory, there are no uncollected notes produced, no schedule of them exhibited, no books of account produced. The annual returns show no money collected. Under this state of things, with these shamefully meagre returns, how is this plaintiff to go back to the days of his early childhood and " show that *the money* was collected, or collectable "? There was error in this charge.

4. Again, the plaintiff in error excepts to the charge of the Court, given at the request of defendant's counsel, in the language following: " That the returns of the defendant having been allowed by the Court of Ordinary of Laurens county, and adjudged by a Court of competent jurisdiction, are *prima facie* evidence of the correctness of the returns used, will be conclusive, unless reversed or impeached for fraud or other cause."

This is, undoubtedly, the general rule of law, as applied to returns made in conformity with law, and upon the face of which there is no reason apparent for suspecting that they are illegal or fraudulent. If, for example, the Ordinary should pass and record accounts not verified, or containing a return of large expenditures wholly unsustained by vouchers, surely such returns would not make a *prima facie* case for the executor or administrator returning them. By the Act of 18th Dec., 1792, Cobb's Dig., 306, executors and administrators are required, annually, to render to the Register of Probates, (Court of Ordinary,) a just and true account, upon oath, of the *receipts* and *expenditures* of such estates, the preceding year. By reference to the returns, as

Smith *vs.* Griffin.

certified and exhibited in evidence, we find that, having qualified as executor, in the early part of the year 1819, the defendant made, after the return of the inventory and appraisement, but six returns, as follows: Three returns of expenditures, made severally in the years 1820, 1824 and 1828. A return of sales made in 1821, on twelve months' credit, *not verified*, and the proceeds never brought into his annual returns. A return of a cash sale, made in 1823, not *verified*, amounting to $80 25, which is the sole acknowledgment, in all his returns, from first to last, of cash received. Lastly, a return, made 5th September, 1825, of desperate debts.

Thus, it is seen, there are but three returns, strictly of the description denominated "*annual,*" with an interval between the first and the last of eight years. He did not, then, make *annual* returns of *receipts* and expenditures. Again, it appears that in neither of these three returns is there acknowledged the receipt of one cent of money. Whilst there are three returns of expenditures, there is no return of receipts, save the unverified account of a cash sale, above mentioned, which, for lack of verification, is illegal. We do not question, that in the course of a long administration, there may be one or more returns, entirely true and legal, showing only expenditures. But what shall be said of an administration of an estate, the inventory of which shows personalty, amounting to $17,344 99, (besides several hundred acres of land,) commenced more than forty years since, never closed to this day—in which there have been but three returns of expenditures and none of receipts.

Again, the inventory shows that he rendered to the appraisers an aggregate of debts due to the estate, of $9,621-97. More than six years after the date of this inventory, (a lapse of time sufficient for the collection of all collectable debts, and for the bar of the statute of limitations to have attached to all debts due at that time,) he made a return of desperate debts, amounting to $2,123 98. What has become of the remainder of $7,500? The presumption of law is that this remainder was collected; but when collected, how

Smith *vs.* Griffin.

much interest collected upon it? Why not returned as collected? It is impossible to resist the conclusion, that these returns are illegal—are fraudulent. They stand before the Court self-impeached. They make no *prima facie* case for the executor, they are to be taken most strongly against him; they call for the opening widely of the door for the admission of evidence in behalf of the plaintiff, and the stringent administration of the law against the defendant. We take it for granted that the attention of his Honor, the Judge of the Court below, was not called to the character of these returns, and that, in the absence of such a call, and in the hurry of a *nisi prius* trial, he had not (enveloped as they are in a terribly voluminous record,) found opportunity to scrutinize them. With more enlarged privileges of time and opportunity, we have felt ourselves severely tasked by the investigation, and doubt not that, upon careful scrutiny, he will arrive at our conclusion. At all events, we are constrained to hold that there was error in this charge, as applied to these returns.

5. Error is further alleged against the following charge: "That the return of certain notes and accounts, as desperate, cannot be impeached by evidence simply of the solvency of the debtors; that complainant must not only show the debts to have been solvent but collectable; and that without such evidence, the judgment of the Court of Ordinary allowing said accounts and notes as desperate, is conclusive."

We think this charge goes rather far in favor of the defendant. It should, on this point, have been to this effect: "The judgment of the Court of Ordinary, allowing a schedule of desperate debts, is *prima facie* evidence in favor of the defendant, and of course conclusive, unless rebutted. But it is competent for the plaintiff to prove in rebuttal that the debtors named in the schedule were solvent, and that, by the use of due diligence, payment might have been enforced; that such evidence, if credible, was sufficient to shift the *onus*, and require the defendant to show why these debts were not collected; and that it was the province of the jury to determine, from all the evidence, whether or not the defend-

ant should be charged with any debts standing in that class. If there be satisfactory evidence of the solvency of a debtor, during several consecutive years, a debt due by him in the first of those years, can scarcely be *desperate.* Such evidence should have been received, and the question of liability referred to the jury.

For the reasons assigned, we have no hesitation in reversing the judgment of the Court below, and sending the case back for a rehearing.

Judgment reversed.